# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| DENNIS PALKON AND HERBERT WILLIAMSON, <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY B. MAFFEI, ALBERT E. ROSENTHALER, MATT GOLDBERG, JAY C. HOAG, BETSY MORGAN, GREG O'HARA, JEREMY PHILIPS, TRYNKA SHINEMAN BLAKE, JANE JIE SUN, ROBERT S. WIESENTHAL, LARRY E. ROMRELL, J. DAVID WARGO, MICHAEL J. MALONE, CHRIS MUELLER, and CHRISTY HAUBEGGER, <br><br> Defendants, <br><br> and <br><br> TRIPADVISOR, INC. AND LIBERTY TRIPADVISOR HOLDINGS, INC., <br><br> Nominal Defendants. | C.A. No. 2023-0449-JTL |

## OPINION DENYING MOTION TO DISMISS EXCEPT AS TO PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF

Date Submitted: November 8, 2023
Date Decided: February 20, 2024

Gregory V. Varallo, Andrew E. Blumberg, Mae Oberste, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Kimberly A. Evans, Robert Erickson, BLOCK & LEVITON LLP, Wilmington, Delaware; Sara D. Swartzwelder, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Jeremy Friedman, David Tejtel, Christopher Windover, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New

York; Jason Leviton, Joel Fleming, Amanda Crawford, BLOCK & LEVITON LLP, Boston, Massachusetts; D. Seamus Kaskela, Adrienne Bell, KASKELA LAW LLC, Newtown Square, Pennsylvania; *Attorneys for Plaintiffs Dennis Palkon and Herbert Williamson.*

Kevin R. Shannon, J. Matthew Belger, Jaclyn C. Levy, Justin T. Hymes, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Matthew W. Close, Jonathan B. Waxman, O'MELVENY & MYERS LLP, Los Angeles, California; Abby F. Rudzin, Asher Rivner, O'MELVENY & MYERS LLP, New York, New York; *Attorneys for Defendants Gregory B. Maffei, Albert E. Rosenthaler, Larry E. Romrell, J. David Wargo, Michael J. Malone, Chris Mueller, Christy Haubegger, and Nominal Defendant Liberty TripAdvisor Holdings, Inc.*

Bradley R. Aronstam, S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; John A. Neuwirth, Evert J. Christensen, Jr., Stefania D. Venezia, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Attorneys for Defendants Matt Goldberg, Jay C. Hoag, Betsy Morgan, Greg O'Hara, Jeremy Philips, Trynka Shineman Blake, Jane Jie Sun, and Robert S. Wiesenthal, and Nominal Defendant TripAdvisor, Inc.*

**LASTER, V.C.**

A Delaware corporation has two classes of stock. The CEO/Chair owns high-vote shares carrying a majority of the outstanding voting power, giving him hard majority control. The board decides to convert the Delaware corporation into a Nevada corporation, and the CEO/Chair delivers the necessary stockholder vote. The board does not establish any protections to simulate arm's length bargaining. The conversion is not conditioned on either special committee approval or a majority-of-the-minority vote.

A stockholder plaintiff challenges the conversion.[1] The plaintiff argues that Nevada law offers fewer litigation rights to stockholders and provides greater litigation protections to fiduciaries like the directors and the CEO/Chair. The plaintiff alleges that the directors and the CEO/Chair approved the conversion to secure the litigation protections for themselves. In support of those assertions, the plaintiff cites the materials the board considered, disclosures in the company's proxy statement, the work of distinguished legal scholars about the content of Nevada law, and public statements by Nevada policy makers about the direction Nevada law has taken.

The defendants move to dismiss the complaint, arguing that it fails to state a claim on which relief can be granted. The outcome depends in the first instance on the standard of review.

---

[1] There are really two corporations and two conversions. They are substantively identical for purposes of the Delaware law analysis. For now, we are keeping it simple by speaking about only one.

As depicted, the conversion constitutes a self-interested transaction effectuated by a stockholder controller. The reduction in the unaffiliated stockholders' litigation rights inures to the benefit of the stockholder controller and the directors. That means the conversion confers a non-ratable benefit on the stockholder controller and the directors, triggering entire fairness. There are no protective devices that could lower the standard of review. Entire fairness governs.

With entire fairness as the operative standard of review, the plaintiff has stated a claim on which relief can be granted. The entire fairness standard has two dimensions: substantive fairness (fair price) and procedural fairness (fair dealing).

The floor for substantive fairness is whether stockholders receive at least the substantial equivalent in value of what they had before. Before the conversion, the stockholders held shares carrying the bundle of rights afforded by Delaware law, including a set of litigation rights. After the conversion, the stockholders owned shares carrying a different bundle of rights afforded by Nevada law, including a lesser set of litigation rights. That makes it reasonably conceivable that the stockholders do not possess at least the substantial equivalent of what they possessed before, supporting an inference that the conversion was not substantively fair.

The test for procedural fairness is whether the process leading to the conversion adequately simulated arm's length bargaining. As depicted, the stockholder controller and the board did not implement any procedural protections. The board recommended the conversion, and the stockholder controller delivered the

vote. Those allegations support an inference that the conversion was not procedurally fair.

The plaintiff therefore has stated a claim on which relief can be granted. That holding does not require finding that Nevada provides greater protection against fiduciary liability than Delaware law. The question at this stage is whether it is reasonably conceivable that Nevada law offers greater protection. The complaint alleges facts suggesting that it does, that the defendants think so too, and that the defendants sought to capture those benefits for themselves through the conversion. This decision must credit the complaint's allegations.

Holding that the plaintiffs have stated a claim on which relief can be granted does not discriminate against Nevada entities. The same reasoning would apply if a Delaware corporation converted into another Delaware entity in a transaction with comparable implications. Using the contractual freedom conferred by the Delaware Limited Liability Company Act, entity planners can implement a wide array of governance schemes that provide fewer rights to investors than what stockholders in a Delaware corporation enjoy. If a Delaware corporation converted into a Delaware LLC where the governing agreement had eliminated all fiduciary duties, then the same reasoning would hold. Entity planners could even design a Delaware LLC that mirrors the internal governance structure of a Nevada corporation. If a Delaware corporation converted into that LLC, the outcome would be the same.

Holding that these plaintiffs have stated a claim on which relief can be granted does not mean that corporations cannot leave Delaware. The plaintiffs have asked for

3

an injunction to block the company's departure, but even on the facts alleged, it is not reasonably conceivable that the court would enjoin the company from leaving.

Nor does this decision mean that a corporation can never leave Delaware without litigation risk. If a board proposed a similar conversion for a corporation without a stockholder controller, and if the fiduciaries fully disclosed the consequences of the change in legal regimes, including the effect on stockholder litigation rights, then the stockholders' approval of the conversion would be dispositive, triggering an irrebuttable version of the business judgment rule.[2] If directors proposed a similar conversion for a corporation with a stockholder controller, and if they properly conditioned the transaction on the twin *MFW* protections, then the dual approvals would be dispositive, again triggering an irrebuttable version of the business judgment rule.[3]

The plaintiffs can only state a claim on which relief can be granted because (1) the corporation has a stockholder controller, and (2) the board did not implement any protective provisions. The defendants also did not make any effort to compensate the stockholders for the reduction in their litigation rights. Change any of those variables and the outcome could be different.

---

[2] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[3] *See Kahn v. M&F Worldwide Corp. (MFW)*, 88 A.3d 635 (Del. 2014), *as modified by Flood v. Synutra, Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

Instead, the outcome reflects that fiduciary duties operate unremittingly, as the Delaware Supreme Court has repeatedly held.[4] That includes when fiduciaries effectuate a transaction that will eliminate the protection of Delaware law.

The outcome rests on a sound policy foundation. Delaware strives to maintain a balanced corporation law that protects the interests of both managers and investors. Delaware law gives managers broad discretion to build businesses, take risks, and create value. At the same time, Delaware law protects investors through a combination of statutory provisions and common law fiduciary duties. Because of those protections, investors willingly entrust their capital to Delaware corporations.

---

[4] *See Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) ("Directors of Delaware corporations owe duties of care and loyalty to the corporation and its stockholders. These duties do not operate intermittently, but are the constant compass by which all director actions for the corporation and interactions with its shareholders must be guided." (cleaned up)); *City of Fort Myers Gen. Empls.' Pension Fund v. Haley*, 235 A.3d 702, 718 (Del. 2019) ("It is elementary that under Delaware law the duty of candor imposes an unremitting duty on fiduciaries, including directors and officers, to not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations." (cleaned up)); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 938 (Del. 2003) ("The stockholders of a Delaware corporation are entitled to rely upon the board to discharge its fiduciary duties at all times. The fiduciary duties of a director are unremitting and must be effectively discharged in the specific context of the actions that are required with regard to the corporation or its stockholders as circumstances change." (footnotes omitted)); *Mills Acq. Co. v. Macmillian, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders. This unremitting obligation extends equally to board conduct in a sale of corporate control." (citations omitted)).

If the business judgment rule applied in this setting, then a stockholder controller could reduce the rights investors enjoy by changing the corporation's domicile. That would create a gap in the protections offered by Delaware law. The gap would have knock on effects, and investors would demand greater returns *ex ante* to compensate for the increased risk. The cost of capital for Delaware corporations would go up.

By applying fiduciary duties consistently across all controller transactions, Delaware prevents gaps from forming in its law. A stockholder controller can exit Delaware on fair terms. If the controller does not establish the *MFW* protections up front, then the controller must prove entire fairness. Stockholders receive compensation for their lost rights, and the controlled company can carry on in a new jurisdiction.

Here, the defendants did not establish the *MFW* protections up front, and they will bear the burden of proving entire fairness. The defendants' motion to dismiss is therefore denied.

## I.  FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' complaint and the documents that it incorporates by reference.[5]

---

[5] Citation in the form "DX __" refer to exhibits attached to the Transmittal Affidavit of Justin T. Hymes, dated July 11, 2023.

## A.    The Defendants

TripAdvisor, Inc. ("TripAdvisor" or the "Company") is a Delaware corporation that operates the world's largest travel guidance platform. It has a dual-class capital structure. The Class A common stock carries one vote per share and trades publicly under the symbol "TRIP." The Class B common stock carries ten votes per share and is owned exclusively by Liberty TripAdvisor Holdings, Inc. ("Holdings"). In addition to owning all of the Company's Class B shares, Holdings owns approximately 21% of the Class A shares. Through that stake, Holdings exercises 56% of the Company outstanding voting power while owning barely one fifth of the economic interest.

Holdings has a dual-class capital structure of its own. Its Series A common stock carries one vote per share, and its Series B common stock carries ten votes per share. Both series trade publicly.

Gregory B. Maffei is the CEO and Chairman of Holdings. When the plaintiffs filed this action, Maffei beneficially owned Series B shares carrying 43% of Holdings' voting power. For purposes of their motion to dismiss, the defendants concede that Maffei controls both Holdings and TripAdvisor.

The other defendants are members of either the Company's board of directors (the "Company Board") or Holdings' board of directors (the "Holdings Board"). The members of the Company Board are Maffei, Matt Goldberg, Jay C. Hoag, Betsy Morgan, Greg O'Hara, Jeremy Philips, Albert E. Rosenthaler, Trynka Shineman Blake, Jane Jie Sun, and Robert S. Wiesenthal. The members of the Holdings Board

7

are Maffei, Rosenthaler, Larry E. Romrell, J. David Wargo, Michael J. Malone, Chris Mueller, and Christy Haubegger.

**B.     The Company Board Resolves To Convert TripAdvisor Into A Nevada Corporation.**

At a meeting in November 2022, TripAdvisor management first presented to the Company Board about the possibility of converting TripAdvisor into a Nevada corporation. They benefits included greater protections against litigation for directors and officers, plus lower franchise taxes and fees.

In February 2023, the Company Board revisited the potential conversion. A management presentation noted that the "laws of Nevada would generally permit the Company to offer greater protection to its directors and officers" and reduce the "risk of expensive and time consuming litigation against the Company and its directors and officers." DX 2 at '059. The presentation included a comparison of Delaware and Nevada law and explained that under Nevada law, a director or officer can be liable "only when the plaintiff affirmatively rebuts the business judgment presumption *and* demonstrates that the fiduciary breach involved intentional misconduct, fraud, or a knowing violation of law." *Id.* at '063. The presentation explained that Delaware law applied the entire fairness test to interested transactions with a controlling stockholder, but Nevada law did not unless the plaintiff could rebut the business judgment rule. *Id.* The directors also considered other potential factors associated with the conversion.

In March 2023, the Company Board again considered whether TripAdvisor should become a Nevada entity. A management presentation again noted that

8

Nevada law generally offered greater protection against liability to officers and directors. DX 3 at '090.

At the end of the March meeting, the Company Board unanimously resolved to approve the conversion of the Company into a Nevada corporation. At a meeting in April 2023, the Company Board approved final resolutions authorizing the conversion.

## C. The Holdings Board Resolves To Convert Holdings Into A Nevada Corporation.

During March 2023, Holdings management presented to its directors on potentially converting into a Nevada corporation. The presentation identified the following advantages:

- "Recent case law developments in Delaware, in particular with respect to conflicted controller and 'change of control' transactions, have increasingly emboldened plaintiffs' law firms to bring claims against directors and officers, significant stockholders and the company and have increased potential exposure for these parties[.]"

- "Under Delaware law director liability cannot be eliminated if the court finds a breach of duty of loyalty and D&O carriers often argue duty of loyalty claims are not insured[.]"

- "Cases that are subject to 'entire fairness' review in Delaware (which requires the defendants to demonstrate that the price and process in a transaction were entirely fair) present a high bar and, because of the factual issues involved, it is often difficult for defendants to prevail in the preliminary stages of litigation[.]"

- "Liberty Media [an affiliated public company for which Maffei serves as CEO], its service companies and certain of their portfolio companies have experienced these developments, having been involved in at least 8 stockholder lawsuits in Delaware since 2012 (5 of which were brought in the last 5 years) which have resulted in substantial time and expense to defend and resolve[.]"

9

- "Management believes Nevada law generally provides greater protection from liability to the Company and its D&Os than Delaware law[.]"

- "Nevada law eliminates the individual liability of both officers and directors to the company, its stockholders or its creditors for damages as a result of a breach of fiduciary duty unless the breach involved intentional misconduct, fraud or a knowing violation of law and unless a company's articles of incorporation provide for greater liability[.]"

- "Nevada does not follow *Revlon* duties (duty to get the best price reasonably available in a sale), and instead permits consideration of 'other constituencies' by statute[.]"

DX 5 at '013, '016. Management undertook to explore the idea further and report back to the directors at a later date.

In April 2023, management circulated additional information about the conversion process. The members of the Holdings Board approved the conversion by unanimous written consent.

## D. The Company and Holdings Seek Stockholder Approval.

The Company and Holdings sought stockholder approval for the conversions. They prepared and distributed proxy statements asking stockholders to vote in favor.

The Company's proxy statement called the conversion a "Redomestication." Under the heading "Reasons for the Redomestication," the proxy statement disclosed the following:

- "[T]he Redomestication will provide potentially greater protection for unmeritorious litigation for directors and officers of the Company."

- "The Redomestication will result in the elimination of any liability of an officer or director for a breach of the duty of loyalty unless arising from intentional misconduct, fraud, or a knowing violation of law."

- "[W]e believe that, in general, Nevada law provides greater protection to our directors, officers, and the Company than Delaware law."

10

DX 10 at 29.

The Holdings proxy statement offered similar rationales. Under the heading "Reasons for the Conversion," the Holdings proxy statement disclosed the following:

- "We believe that . . . Nevada law generally provides greater protection against liability for our directors, officers and the company than Delaware law."

- "The conversion will therefore result in the elimination of liability of an officer or director for breaches of fiduciary duties to the company, including its stockholders unless, [sic] involving intentional misconduct, fraud or knowing violation of law."

DX 9 at 40.

At stockholder meetings in June 2023, holders of a majority of the voting power at each company approved each conversion. Assuming Holdings cast all of its votes in favor the Company conversion, only 5.4% of the unaffiliated Company stockholders voted in favor. Assuming Maffei cast all of his votes in favor of the Holdings conversion, only 30.4% of the unaffiliated Holdings stockholders voted in favor. Holdings and Maffei thus provided the decisive votes.

### E. This Litigation

In April 2023, the plaintiffs filed this action. Herbert Williamson alleges that he is a stockholder of Holdings. Dennis Palkon alleges that he is a stockholder of TripAdvisor. They contend that the conversions were self-interested transactions that are not entirely fair.

The complaint sought an injunction to prevent the conversions from closing. The defendants agreed not to effectuate the conversions unless the parties otherwise agree or the court enters an order dismissing the case that has become final.

11

**F.     Late-Breaking News**

On February 9, 2024, the Company announced that it had entered into discussions with Holdings about a going-private transaction and had formed a special committee to oversee those discussions. The announcement stated that any transaction would be subject to the twin *MFW* protections. There was no assurance as to whether an agreement might be reached or when a going-private transaction might happen.

The court asked the parties whether the announcement had implications for the motion to dismiss. The parties agreed that the potential for a transaction at some point in the future did not have any effect on the pending motion, and both sides asked the court to render a decision.

## II.     LEGAL ANALYSIS

The defendants have moved for dismissal under Rule 12(b)(6). When considering such a motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[6]

---

[6] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

12

**A.    Statutory Compliance And The Twice-Tested Framework**

The defendants launch their argument for dismissal by explaining that the conversions complied with Section 266 of the Delaware General Corporation Law (the "DGCL"), which authorizes "[a] corporation of this State [to] . . . convert to . . . a foreign corporation."[7] A conversion historically required both a board recommendation and unanimous stockholder approval. In 2022, the General Assembly amended the statute to require a board recommendation and approval from holders of a majority of the corporation's outstanding voting power.[8]

Assuming the defendants are right about statutory compliance, that does not end the inquiry. "[I]nequitable action does not become permissible simply because it is legally possible."[9] Instead, according to Professor Berle's famous formulation,

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in

---

[7] 8 Del. C. § 266(a).

[8] 83 Del. Laws ch. 377, § 11 (2022).

[9] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 96 (Del. 2021) (quoting *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971)); *see Marino v. Patriot Rail Co.*, 131 A.3d 325, 336 (Del. Ch. 2016) ("Post–1967 decisions by the Delaware Supreme Court . . . rendered untenable the strong-form contention that a statutory grant of authority necessarily foreclosed fiduciary review."); *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002) ("Nothing about [the doctrine of independent legal significance] alters the fundamental rule that inequitable actions in technical conformity with statutory law can be restrained by equity.").

13

favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[10]

"A reviewing court's role is to ensure that the corporation complied with the statute *and* [that its fiduciaries] acted in accordance with [their] fiduciary duties."[11]

The plaintiffs do not contend that the conversions violated the technical requirements of Section 266, so the defendants' arguments about statutory compliance are beside the point. The plaintiffs argue that it is reasonably conceivable that the defendants breached their fiduciary duties when approving the conversions. That claim invokes Professor Berle's second test, not the first.

## B.    The Claim For Breach Of Fiduciary Duty

The real question is whether the complaint states a claim for breach of fiduciary duty. Analyzing that claim requires determining the appropriate standard of review, then evaluating the allegations through that lens. That analysis reveals that the plaintiffs have stated a claim on which relief can be granted.

---

[10] A. A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931); *see Bäcker*, 246 A.3d at 96 (quoting *In re Invs. Bancorp., Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017)); *accord Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *10 (Del. Ch. Apr. 14, 2017) ("Delaware follows the 'twice tested' framework when evaluating challenges to corporate acts."); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014) ("Delaware law adheres to the twice-testing principle.").

[11] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) (emphasis added).

## 1. The Standard Of Review

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[12]

Delaware's default standard of review is the business judgment rule. When applying that standard, a court presumes that the defendant fiduciaries "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[13] Unless a plaintiff rebuts one of the elements of the rule, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[14] Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[15]

---

[12] *Reis*, 28 A.3d at 457.

[13] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000).

[14] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

[15] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

Enhanced scrutiny is "Delaware's intermediate standard of review."[16] Enhanced scrutiny synthesizes the lessons from a series of 1980s decisions, when standards of review seemed to proliferate.[17] Each of the 1980s precedents bore two hallmarks. First, there was a specific, recurring, and identifiable context where the realities of the situation could subtly undermine the decisions of even independent and disinterested directors. Second, the action the directors took intruded into a space where stockholders possess rights of their own.[18] The directors' exercise of corporate

---

[16] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013).

[17] *In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 456–60 (Del. Ch. 2023) (describing proliferation and subsequent unification); *Pell v. Kill*, 135 A.3d 764, 784–85 (Del. Ch. 2016) (explaining how "[p]articularly during the 1980s, standards of review seemed to proliferate," but that Delaware courts have subsequently consolidated the various intermediate standards within the framework of enhanced scrutiny); *Reis*, 28 A.3d at 457–58 (discussing variants of enhanced scrutiny).

[18] *E.g.*, *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954–56 (Del. 1985) (creating intermediate standard of review to address resistance to a tender offer where the situational conflict resulted from the "omnipresent specter" that the directors could have been acting to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders" and the encroachment on stockholder rights involved the stockholders' ability to tender their shares); *see also Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) (applying intermediate scrutiny where situational conflict resulted from the final-period problem in an M&A setting and the encroachment on stockholder rights implicated the stockholders' right to vote on (and potentially reject) the board's preferred transaction, free of unreasonable interference from their fiduciaries); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 787–88 (Del. 1981) (introducing intermediate standard of review of a decision by a special litigation committee where the situational conflict involved the difficult dynamic of directors deciding whether to cause the corporation to sue their fellow directors and the encroachment on stockholder rights involved a stockholder plaintiff's ability to pursue a derivative claim when demand was excused); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 658–59 (Del. Ch. 1988) (introducing intermediate standard of review where directors

16

power therefore raised questions about the allocation of authority within the entity and, from a theoretical perspective, implicated the principal-agent problem.[19] Those situations "do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference [under the business judgment rule]."[20]

Each time a decision addressed one of those situations, the court applied an intermediate standard of review that examined "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[21] Under this standard, the directors must establish that they (i) sought to pursue a legitimate end and (ii) selected an appropriate means of achieving it. It is not enough for the directors to have a good faith belief that a

---

took action in response to an election contest that implicated corporate control and the encroachment on stockholder rights involved the stockholders' right to vote).

[19] To be clear, directors and officers are not agents of the stockholders, nor are the stockholders their principals. "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio,* 251 A.3d 212, 286 ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

[20] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 82 (Del. Ch. 2014), *aff'd sub nom. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

[21] *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

particular outcome is desirable; they must have a reasonable basis for their belief. It is also not permissible for the directors to pursue the desired outcome by any means necessary. They must select a means that falls within a range of reasonableness.

Delaware's most onerous standard is entire fairness. Under that standard, the fiduciary defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price."[22] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[23]

The defendants contend that the business judgment rule protects the conversions. But since 1994 (if not before), Delaware law has deemed the business judgment rule rebutted and applied the entire fairness test *ab initio* to any transaction between the corporation and a controlling stockholder in which the controller receives a non-ratable benefit.[24] Unless the transaction incorporates one or more protective mechanisms, "the standard of review for that decision is entire fairness, with the burden of proof resting on the defendants."[25]

---

[22] *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary IV)*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted).

[23] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[24] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *accord Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 428 (Del. 1997).

[25] *Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *33 (Del. Ch. May 4, 2020).

18

Plaintiffs allege—and for purposes of this motion, defendants concede—that Maffei controls both Holdings and the Company. No one suggests that the conversions were cleansed in any way. Determining the correct standard of review therefore depends on whether the conversions conferred a non-ratable benefit on the fiduciary defendants.

## 2. Non-Ratable Benefits

Under Delaware law, a controller or other fiduciary obtains a non-ratable benefit when a transaction materially reduces or eliminates the fiduciary's risk of liability. Delaware decisions have applied that principle repeatedly to mergers.[26] The parties posit that no Delaware decision has applied those principles to a reincorporation merger, but that is not so. In *Harris v. Harris*, the court explained that Mary Ellen Harris, the sole director of a privately held, family-run corporation was interested in a reincorporation merger that moved the corporation's domicile from Delaware to New Jersey and, in the process, extinguished the minority

---

[26] *E.g., In re AmTrust Fin. Servs., Inc. S'holder Litig.*, 2020 WL 914563, at \*11–12 (Del. Ch. Feb. 26, 2020) (holding that plaintiff pled that merger conferred a non-ratable benefit on the defendants by extinguishing stockholder standing to bring a derivative claim that threatened the defendants with damages that would be material to them personally); *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at \*13 (Del. Ch. June 25, 2018) (crediting that stockholder plaintiffs had stated a direct claim against defendants who extracted non-ratable benefits through a settlement agreement); *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at \*1 (Del. Ch. July 28, 2016) (finding that a complaint adequately alleged that by extinguishing stockholder standing to bring a threatened but not yet pending lawsuit, "a majority of the Defendant directors received a material benefit from the merger not shared by the common stockholders."); *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 487 (Del. Ch. 2013) (same); *see also Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 134–35 (Del. 2021) (adopting *Primedia* framework).

19

stockholders' standing to pursue derivative claims.[27] Those claims sought "to recover compensation and benefits paid to Mary Ellen and the Advisors, making them interested in the litigation."[28] Because the merger extinguished the plaintiffs' standing to pursue those claims, the defendants received a non-ratable benefit from the reincorporation merger.[29] There is no reason why similar principles of law would not apply to a conversion.

In response, the defendants contend that a fiduciary can only receive a material benefit from a reduction in liability exposure if the transaction addresses "existing potential liability."[30] By using that oxymoronic phrase, they mean a situation where the events giving rise to the claim have already occurred, making the liability "existing," even if a judgment has not yet been entered, making the liability "potential." The alternative to "existing potential liability" is "future potential liability," where the events that could give rise to liability have not happened yet.[31].

---

[27] *Harris v. Harris*, 2023 WL 115541, at *14 (Del. Ch. Jan. 6, 2023).

[28] *Id.*

[29] *Id.*

[30] Defs' Op. Br. at 22.

[31] At times, the defendants seem to suggest that a claim asserting an existing-potential liability must have been filed, but Delaware precedent has treated fiduciaries as interested in transactions that materially reduced their liability exposure even without a pending lawsuit. *See New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 172 (Del. Ch. 2023) (finding that directors were interested in third-party merger that extinguished sell-side stockholder standing to assert derivative claims, rendering entire fairness the governing standard of review, despite the absence of any filed claim); *In re Orbit/FR, Inc. S'holders Litig.*, 2023 WL 128530, at *4 (Del.

The defendants' arbitrary distinction between existing potential liability and future potential liability would make Delaware law piteously naive. Real-world actors have no difficulty understanding that litigation risk can exist even though the specific events have not happened yet. Delaware law can too.

Insurance premiums present a multi-trillion dollar problem for the defendants' distinction. When a policy issues, none of the events that could give rise to a claim have happened yet. In the defendants' parlance, all of the insured's potential losses are future potential liabilities, not existing potential liabilities. But that does not undermine the policy's value. The market for insurance exists because humans understand the importance of mitigating risk for future potential liabilities. Obtaining coverage for future potential liabilities is a benefit, and insureds pay premiums to get it.

Think about whether a change in coverage for future potential liabilities might matter to an insured. For any given level of coverage, its real value to the insured depends on the conditions that the insured must meet to make a successful claim. All

Ch. Jan. 9, 2023) (explaining that a controlling stockholder and the director defendants were interested in a merger that extinguished the stockholders' standing to assert derivative claims for corporate looting, even though a stand-alone breach of fiduciary duty claim concerning those matters had not been filed); *Riverstone*, 2016 WL 4045411, at *14–15 (holding that director defendants were interested in a merger that extinguished the stockholders' standing to assert a corporate opportunity claim where lawsuit was threatened but not yet filed). It would easy to fixate on the defendants' references to an existing lawsuit and use those precedents to defeat that strawman. The steelman version of the defendants' argument does not fixate on whether a lawsuit has been filed but rather contends that the conduct giving rise to a potential claim must have occurred.

else equal, a policy with greater conditionality has less value, because it will be more difficult for the insured to recover. An insured does not get as much benefit from the same dollar value of coverage if onerous conditions make recovery less likely. Conversely, an insurer gets greater benefit from the same dollar value of premium if onerous conditions mean the insurer is less likely to pay.

Now imagine an insurer that can ratchet up the conditions for coverage at will (either through express changes or by applying them differently). With more onerous conditions, the coverage has less value to the insured, and the premium paid has more value to the insurer. It does not matter that all of the situations where coverage could apply continue to involve future potential liabilities rather than existing potential liabilities. The change in the likelihood of coverage imposes a detriment on the insured and confers a benefit on the insurer.

The insurance example maps onto this case. Corporate law gives stockholders the right to recover from their fiduciaries for certain types of wrongdoing. Stockholders do not pay insurance premiums to secure that right; it exists because of the principles of equity that govern fiduciary behavior.[32] If the law changes such that recovery becomes more difficult, then the right to pursue the recovery has less value.

_____

[32] As a matter of economic theory, the right to sue is part of the governance package that public stockholders price when they purchase shares in the IPO. Considerable doubt exists about whether IPO investors can price governance regimes accurately. *See* Albert H. Choi, *Pricing Corporate Governance*, 75 U.C. L.J. 67, 72 n.14 & 74–78 (2023) (collecting scholarship casting doubt on whether IPO market is informationally efficient).

In insurance terms, the fiduciaries are less likely to pay. As with the insurance policy, the change imposes a detriment on stockholders and confers a benefit on the fiduciaries. It does not matter that the events that could give rise to a claim have not happened yet.[33]

The arbitrary nature of the existing-potential versus future-potential distinction shines through for other stockholder rights as well. Assume that a transaction alters an economic right, such as the right to receive dividends when and if declared by the board. Envision that before the transaction, each share of stock carries the right to receive a pro rata portion of any dividend declared by the board, but that after the transaction, each share only carries the right to receive a pro rata portion of any dividend declared by the board if that share is held by a director. Under the defendants' approach, that change could confer a benefit on the insiders only if the transaction took place after the board declared a dividend and before it was distributed, because only then would there be an existing-potential opportunity to receive the dividend. Yet it is easy to see that the change reallocates economic value regardless of whether an existing dividend has been declared. The reallocation might

---

[33] Other real-world settings offer similar lessons. The Delaware Supreme Court authorized the use of the *MFW* framework to enable controllers to mitigate litigation risk. But if the defendants are right, no one would use it: The structure guards against future potential liabilities, not existing potential liabilities, and according to the defendants, the latter are always immaterial. M&A agreements illustrate the same point. Corporate lawyers charge thousands of dollars per hour to haggle over the precise language of material adverse effect clauses and other conditions. Under the defendants view of the world, that's irrational. Those provisions address future potential issues, not existing potential issues, so no one should care.

only affect future-potential dividends, but that provides little comfort to the unaffiliated stockholders. Their share of any future dividend will go to the insiders. That is a non-ratable benefit to the insiders, even though the benefit will manifest itself tangibly from future-potential dividends rather than an existing-potential dividend.

Moving from litigation claims to economic rights points to another multi-trillion-dollar problem for the defendants' theory: the options market. Envision a standard American call option to purchase a share of common stock with the strike price set at the market price on the grant date. The intrinsic value of the call option on the grant date is zero. But the call option has value because there are future states of the world in which the stock price exceeds the strike price. The Black-Scholes method is one way of measuring that value.

Using defendant's concepts, the call option has no value. As they see it, only existing-potential value matters, and the call option has none of that because none of the states of the world in which the call option has intrinsic value have occurred. Yet we know people value that type of option. Just ask executives and employees who demand them as part of their compensation packages. Deeply out-of-the-money options and futures reveal the concept even more clearly. Derivatives covering trillions of dollars in notional value exist because parties care about future-potential events.

The defendants' distinction is therefore hard to follow. It also lacks persuasive support in case law. To justify their fixation on existing potential liability, the

24

defendants rely primarily on four cases: *Bamford,*[34] *Orloff,*[35] *Coates,*[36] and *Sylebra.*[37] They cite *Chevron*[38] and *Underbrink*[39] in passing.

Read together, those cases do not support a temporal distinction. They support a materiality rule. To be fair, some of the cases use temporal language, but the real pivot is materiality. That should not be surprising. A fiduciary is interested in a transaction when it confers a material benefit on the fiduciary.[40] The cases treat litigation protection as a benefit and ask whether the reduction in litigation risk is material.

---

[34] *Bamford v. Penfold, L.P.,* 2022 WL 2278867 (Del. Ch. June 24, 2022), *reargument granted in part,* 2022 WL 3283869 (Del. Ch. Aug. 10, 2022).

[35] *Orloff v. Shulman,* 2005 WL 3272355 (Del. Ch. Nov. 23, 2005).

[36] *Coates v. Netro Corp.,* 2002 WL 31112340 (Del. Ch. Sept. 11, 2002).

[37] *Sylebra Cap. P'rs Master Fund, Ltd. v. Perelman,* 2020 WL 5989473 (Del. Ch. Oct. 9, 2020).

[38] *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.,* 73 A.3d 934 (Del. Ch. 2013).

[39] *Underbrink v. Warrior Energy Servs. Corp.,* 2008 WL 2262316 (Del. Ch. May 30, 2008).

[40] *In re Pattern Energy Gp. Inc. S'holder Litig.,* 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021) ("To plead interestedness, a plaintiff can plead the fiduciary received 'a personal financial benefit from the transaction that is not equally shared by the stockholders[.]") (quoting *In re Saba Software S'holder Litig.,* 2017 WL 1201108, at *21 (Del. Ch. Mar. 31, 2017)); *Orman v. Cullman,* 794 A.2d 5, 23 (explaining that a benefit conferred on a director is material when "the alleged benefit was significant enough 'in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.'") (quoting *In re Gen. Motors Class H S'holders Litig.,* 734 A.2d 611, 617 (Del. Ch. 1999)).

25

The *Bamford* litigation involved a closely held LLC with three members. One of the members—Joseph Manheim—held a majority of the member interests. Manheim and a second member worked for the LLC; the third was a passive investor. After Manheim fired the other working member, souring that relationship, the passive member became suspicious about Manheim's actions. Anticipating litigation, Manheim adopted a new LLC agreement that contained an "impressively broad exculpatory provision."[41] Manheim sought to make the exculpatory provision "not just prospective, but retrospective as well."[42]

When the other members filed suit, Manheim invoked the exculpation provision. The court held that adopting the provision was "a self-interested decision that can be reviewed in equity."[43] Entire fairness applied because the provision reduced Manheim's litigation exposure, and he had not attempted to show that the provision was entirely fair. The court therefore held that the provision was ineffective. In reaching this conclusion, the court found that "[i]t was not equitable for Manheim to implement the [provision] unilaterally in an effort to eliminate all liability, prospectively and retrospectively, for any fiduciary breach."[44]

---

[41] *Bamford*, 2022 WL 2278867, at *33.

[42] *Id.* at *34.

[43] *Id.*

[44] *Id.*

*Bamford* did not distinguish between existing-potential and future-potential liability. That adoption of the exculpatory provision was plainly material, rendering Mannheim interested. The *Bamford* decision does not support a temporal rule. It supports a materiality rule.

The same is true with *Orloff*. There, the individuals who controlled a corporation adopted a Section 102(b)(7) provision after minority stockholders had filed a books-and-records action. In subsequent plenary litigation, the plaintiffs alleged that the defendants approved the provision "under the threat of imminent litigation, and breached their fiduciary duties by self-interestedly protecting themselves against litigation that they knew would soon name them as defendants."[45] The court dismissed the claim, finding that the plaintiffs failed to adequately allege "facts creating a reasonable doubt that the directors were disinterested or independent when they made their decision to approve the certificate amendment."[46]

---

[45] *Orloff*, 2005 WL 3272355, at *6.

[46] *Id.* at *13. The *Orloff* court seems to have viewed the question of whether a director is interested in the adoption of a Section 102(b)(7) provision as settled, noting that "[t]he court has at least twice before rejected claims of this kind, noting that they are 'but variations on the 'directors suing themselves' and 'participating in the wrongs' refrain." *Id.* at *13 (quoting *Decker v. Clausen*, 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989), and *Caruana v. Saligman*, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990)). Those internal quotations do not seem relevant to whether the adoption of a Section 102(b)(7) provision is a self-interested act; they seem tied to demand futility. And that turns out to be what the *Decker* and *Caruana* decisions addressed.

In *Decker*, the plaintiff asserted what today would be recognized as a *Caremark* claim, and the defendants moved to dismiss under Rule 23.1. The plaintiff argued that the directors faced a substantial risk of personal liability that prevented them from considering a demand disinterestedly because "insurance would not cover an

27

A director is interested in a transaction when it confers a material benefit on the director. The Section 102(b)(7) provision in *Orloff* only protected against monetary damages for a breach of the duty of care, and by statute, it could only apply

---

action brought by the company against its own directors" and alleged that the directors necessarily feared the lawsuit because they had recommended the adoption of a Section 102(b)(7) provision. 1989 WL 133617 at *2. The *Decker* court dismissed the *Caremark* claim because demand was not futile. The case did not involve a challenge to the exculpatory provision itself.

Likewise in *Caruana*, the plaintiffs asserted a derivative claim challenging the sale of a subsidiary to certain insiders. The defendants moved to dismiss under Rule 23.1. As in *Decker*, the plaintiffs argued that the defendants faced a substantial risk of personal liability that prevented them from considering a demand disinterestedly because "liability insurance would not cover an action brought by the company against its own directors," and they alleged that the directors were concerned about the lawsuit because "the directors recommended a charter amendment limiting their liability." 1990 WL 212304, at *3. The court cited *Decker* to hold that those allegations were insufficient to establish interestedness and did not analyze the issue further. *Id.* at *4.

There is a difference between (i) arguing that directors are interested in the adoption of a Section 102(b)(7) provision because they will benefit from the reduction in liability exposure that the provision confers and (ii) arguing that the directors must inferably face a substantial risk of liability on an otherwise unrelated derivative claim because they proposed the adoption of a Section 102(b)(7) provision. The *Decker* and *Caruana* cases addressed the latter scenario. The *Orloff* decision treated those rulings as if they also applied to the former issue. The *Orloff* decision did not explain why. That makes *Orloff* a weak precedent in its own right.

In the vast majority of cases, there is no valid fiduciary challenge to the adoption of a Section 102(b)(7) provision because stockholders approve it. *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996). The fiduciary duty issue arises when the directors who recommend the provision also deliver the vote. That was the case in *Orloff*, but the court did not focus on that question. In a later decision involving the same issue—the adoption of an exculpatory provision by a controller—the court treated the challenge to the provision as settled by *Caruana*, *Decker*, and *Orloff*. *Sutherland v. Sutherland*, 2010 WL 1838968, at *14–15 (Del. Ch. May 3, 2010). In reality, no Delaware decision has directly confronted the question.

28

prospectively.[47] The *Orloff* court thus could readily conclude that the Section 102(b)(7) provision did not confer a material benefit on the fiduciaries who adopted it. The *Orloff* decision also rejected a complaint that was generalized and conclusory.[48] Read properly, the *Orloff* supports a materiality rule as well.

The *Coates* case likewise points to a materiality rule. A stockholder plaintiff challenged a reincorporation merger, but with the corporation moving from California to Delaware. In the proxy statement, the board acknowledged that "Delaware law provided more protections for the board" and cautioned that stockholders should take that conflict of interest into account when considering their recommendations.[49] After the merger closed, a stockholder filed suit in Delaware. The plaintiff primarily raised disclosure violations, but also argued that the directors were interested in the merger due to Delaware's more favorable law. After rejecting the alleged disclosure violations, Chancellor Chandler held that the complaint did not sufficiently plead any facts suggesting interestedness. He did not reject the idea that directors could be interested in a transaction that conferred greater legal protections.[50] He instead held

---

[47] *See* 8 *Del. C.* § 102(b)(7) ("No such provision shall eliminate or limit the liability of a director or officer for any act or omission occurring prior to the date when such provision becomes effective.").

[48] *Orloff*, 2005 WL 3272355, at *14 ("Nor do the plaintiffs' allegations in this complaint allege particularized facts creating a reasonable doubt that the directors were disinterested or independent when they made their decision to approve the certificate amendment.").

[49] *Coates*, 2002 WL 31112340, at *1.

[50] *Id.* at *5.

that the plaintiff had not sufficiently pled self-interested conduct based solely on the directors' acknowledgment that "a possible conflict of interest may arise from the greater protections afforded directors under Delaware law."[51] The Chancellor declined to credit what he regarded as a "mere conclusory statement" with no supporting factual predicate.[52] The plaintiff thus failed to allege facts supporting an inference that the merger conferred a material benefit on the directors.

The fourth case—*Sylebra*—at first seems close to this one because it too involved a corporation moving from Delaware to Nevada.[53] But the plaintiffs in *Sylebra* sued in Delaware nearly two years after the merger closed, in violation of a forum-selection bylaw specifying the Nevada courts, and only after the Nevada corporation implemented a forced redemption transaction that they sought to challenge. The court refused to address the merits of the plaintiffs' claims and dismissed the case based on the forum-selection bylaw.[54] The *Sylebra* decision has nothing to do with the point the defendants are trying to make.

In passing, the defendants cite *Chevron* and *Underbrink*. They suggest that the *Chevron* court considered whether a forum-selection bylaw created a

---

[51] *Id.*

[52] *Id.*

[53] *Sylebra*, 2020 WL 5989473, at *6.

[54] *Id.* at *7 ("I will not address the merits of the claims under Rule 12(b)(6)."); *id.* at *14 (dismissing based on forum selection bylaw).

30

disqualifying interest, but that is not accurate. The case involved a facial challenge to the validity of a forum-selection bylaw, and in the section the defendants cite, the court declined to consider as-applied challenges based on whether the bylaw might operate unreasonably in future cases.[55] The defendants have taken language out of context. Regardless, for a Delaware corporation to use a forum-selection bylaw to concentrate internal affairs litigation in Delaware court would not confer a material benefit on its fiduciaries. The bylaw only changes the forum, not the law or the fiduciaries' litigation exposure. To the extent that plaintiffs might be able to secure greater recoveries in other forums, that is not due to differences in substantive law, but rather the increased volatility that results when courts apply law with which they are less familiar.[56] Concentrating cases in Delaware thus does not reduce litigation exposure relative to what outcomes should be, meaning that the forum-selection bylaw does not confer any benefit, much less a material one.

The last decision—*Underbrink*—held after trial that entire fairness would not apply to a board's decision to adopt a mandatory advancement bylaw where the

---

[55] *Chevron*, 73 A.3d at 961–62,

[56] That is not a knock on other courts; it is a function of the comparative advantages that come from specialization. Delaware judges regularly decide cases under Delaware law. Judges in other jurisdictions do so far less often. Delaware judges therefore have a comparative advantage in deciding cases under Delaware law. That is true for every jurisdiction and subject-matter. For example, I rarely decide cases under California law. I am confident that California judges have a comparative advantage in deciding cases under California law. A party who litigates a case involving California law in front of me should therefore expect greater volatility in the potential result than if a California judge were deciding the case.

benefit conferred was not material.[57] The *Underbrink* decision interpreted *Orloff* as supporting a temporal distinction and put heavy emphasis on that concept when assessing materiality. But the ultimate question for purposes of rebutting the business judgment rule was materiality, not temporal orientation.

The real question for determining the standard of review is whether a decision confers a material benefit on the fiduciaries who made it. Here, it is reasonable to infer at the pleading stage that the conversions will confer a material benefit on the fiduciary defendants who approved them. The defendant directors focused on the ability of the conversions to reduce or eliminate litigation risk. The board materials discussed those issues and called out past cases. And the proxy statements told the stockholders that the directors were recommending the conversions to reduce or eliminate litigation risk.

During the hearing on the motion to dismiss, the defendants seemed to acknowledge that materiality is what matters, because their counsel sought to argue that Nevada law—properly understood—is not more protective than Delaware law. This decision does not rule on that issue. At the pleading stage, it is reasonable to infer from the complaint's allegations that Nevada law provides greater protection to fiduciaries and confers a material benefit on the defendants. To the extent the defendants wish to show that Delaware law and Nevada law are equivalent, they can attempt to make that showing at a later phase of the case.

---

[57] *Underbrink*, 2008 WL 2262316, at *13.

The plaintiffs have alleged particularized facts demonstrating that the defendants were interested in the conversions. Entire fairness therefore applies.

### 3.     The Feasibility Of Applying The Entire Fairness Standard

The defendants separately argue that entire fairness cannot supply the standard of review because the court cannot feasibly apply that standard outside of a transaction in which stockholders received cash for their shares. They ask rhetorically, "how would the Court even conduct an entire fairness review, where there is no 'price' to be assessed for fairness?"[58] That objection misunderstands the entire fairness test.

Entire fairness is a unitary standard that has both substantive and procedural dimensions. Although the two aspects may be examined separately, they are not separate elements of a two-part test. "All aspects of the issue must be examined as a whole since the question is one of entire fairness."[59]

The substantive dimension of the fairness inquiry examines the transactional result. The cases that developed the entire fairness test historically involved freeze-outs or squeeze-outs. The earliest freeze-outs involved corporations selling all of their assets for a package of consideration, typically cash, then dissolving and distributing

---

[58] *See* Reply Br. at 12.

[59] *Weinberger*, 457 A.2d at 711.

33

the net cash to stockholders.[60] After mergers became the preferred transactional vehicle, the leading cases involved squeeze-outs in which the minority shares were converted into the right to receive a specific amount of cash.[61] The substantive fairness of the transaction therefore largely turned on the price that the minority stockholders received, and "fair price" became the dominant nomenclature for the substantive dimension. In that setting, the fair price inquiry generally involved comparing what the stockholders received with their proportionate share of the corporation's value as a going concern. Thus, in the canonical framing, fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[62] But the substantive dimension of the entire fairness inquiry has never been narrowly focused on evaluating a price. The true "test of fairness" is whether the minority stockholder receives at least "the substantial equivalent in value of what he had before."[63]

---

[60] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033–34 (Del. Ch. 2020) (describing history of asset sales and mergers).

[61] *Id.*

[62] *Weinberger*, 457 A.2d at 711.

[63] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.'" (quoting *Sterling*, 93 A.2d at 114)); *see* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in*

The procedural dimension of the entire fairness inquiry examines the process that generated the result. Known as "fair dealing," it "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[64] The procedural dimension "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[65]

The procedural dimension matters because the substantive dimension is often contestable. "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective."[66] Instead, a judgment concerning fairness "will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case."[67] Thus, if fiduciaries successful replicate arm's length

---

*Delaware Appraisal Law*, 31 J. Corp. L. 119, 139 (2005) (arguing for a remedial standard that "provides the minority shareholders with the value of what was taken from them . . . .").

[64] *Tremont II*, 694 A.2d at 430.

[65] *Weinberger v. UP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[66] *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *8 (Del. Ch. Mar. 21, 1996) (Allen, C.) ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept."), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[67] *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III)*, 663 A.2d 1134, 1140 (Del. Ch. 1994) (Allen, C.), *aff'd, Technicolor Plenary IV*, 663 A.2d 1156 (Del. 1995).

bargaining, then that that evidence of fair dealing can validate a debatable outcome. But the opposite is also true: a dubious process can call into question a low but nominally fair price.[68] "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[69] Where those factors are present, a court

[68] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018) ("Just as a fair process can support the price, an unfair process can taint the price."), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. Nov. 4, 1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd*, 776 A.2d 437 (Del. 2000) (per curium).

[69] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *19 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE).

may conclude that the transaction is not entirely fair. As a remedy, the court could award a "fairer price"[70] or rescissory damages.[71]

Numerous decisions have applied the entire fairness test to transactions other than freeze-outs or squeeze-outs in which stockholders received a specific amount of cash per share.[72] Here are a few examples:

- In *Nixon v. Blackwell*, the controlling stockholders of E.C. Barton & Co. generated liquidity for themselves and select company employees by using an employee stock option plan and key man life insurance policies to repurchase

---

[70] *Id.*; *accord Reis*, 28 A.3d at 467 ("Depending on the facts and the nature of the loyalty breach, the answer can be a 'fairer' price."); *see, e.g., In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *2 (finding that controller and his associate had engaged in fraud; holding that "[u]nder these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116–17 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Bomarko,*, 794 A.2d at 1184–85 (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts).

[71] *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023–24 (Del. 2001); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501–03 (Del. 1981), *overruled on other grounds, Weinberger*, 457 A.2d at 703–04.

[72] *See generally In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11–16 (Del. Ch. Jan. 25, 2016) (collecting authorities).

shares. The minority stockholders were not eliminated for a specific price per share, yet the Delaware Supreme Court applied the entire fairness test.[73]

- In *Trans World Airlines,* a corporation purchased or leased aircraft from its controlling stockholder. Those transactions were not freeze-outs or squeeze-outs and there was no cash price per share, yet the Delaware Supreme Court applied the entire fairness test.[74]

- In *Tremont I*, Tremont Corporation purchased 15% of the stock of NL Industries, Inc. from Valhi, Inc. When the transaction took place, Harold Simmons controlled all three corporations. The transaction did not have an obvious per-share price, but both Chancellor Allen and the Delaware Supreme Court applied the entire fairness test.[75]

- In *T. Rowe Price*, Seaman Furniture Company entered into a services agreement with another company owned by Seaman's controlling stockholder. Seaman agreed to manage stores and provide operational expertise to the company in return for a multi-million dollar annual fee. The transaction did not involve stockholders receiving a specific price per share, but Vice Chancellor Lamb applied the entire fairness test.[76]

- In *Harbor Finance Partners*, a company repurchased a block of its notes from its controlling stockholder. The transaction was not a freeze-out or squeeze-out involving a specific price per share, but Justice Jacobs, then a Vice Chancellor, applied the entire fairness test.[77]

Many more examples exist.[78]

---

[73] *Nixon v. Blackwell*, 626 A.2d 1366, 1375 (Del. 1993).

[74] *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 406 (Del. 1988).

[75] *Tremont I*, 1996 WL 145452, at *7, *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[76] *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 551 (Del. Ch. 2000).

[77] *Harbor Finance P'rs v. Sugarman*, 1997 WL 162175, at *2 (Del. Ch. Apr. 3, 1997).

[78] *E.g., Tornetta v. Musk,* — A.3d —, —, 2024 WL 343699, at *1 (Del. Ch. Jan. 30, 2024); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183–85 (Del.

Taken to its logical extreme, the defendants' argument would mean that a court could not apply entire fairness in a stock-for-stock merger, because there is no dollars-and-cents price. Yet the Delaware courts have applied the entire fairness test to parent-subsidiary mergers in which the minority shares were converted into the right to receive stock.[79] Not only that, but the defendants' argument logically means that a Delaware court cannot conduct an appraisal after a stock-for-stock merger. The fair price analysis and the fair value analysis involve parallel inquiries,[80] so if a court cannot analyze the entire fairness of stock-for-stock merger due to the lack of a per-share price, then a court cannot conduct an appraisal either. Yet the DGCL contemplates appraisal following stock-for-stock mergers (unless the market-out exception applies).[81]

---

Ch. 2014); *Dweck v. Nasser*, 2012 WL 161590, at *22 (Del. Ch. Jan. 18, 2012); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *12 n.108 (Del. Ch. July 26, 2010); *Monroe Cnty. Empls.' Retirement Sys. v. Carlson*, 2010 WL 2376890, at *1 (Del. Ch. June 7, 2010); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *20 (Del. Ch. Sept. 19, 2008); *Carlson v. Hallinan*, 925 A.2d 506, 529–30 (Del. Ch. 2006); *Flight Options Int'l, Inc. v. Flight Options, LLC*, 2005 WL 5756537, at *7 (Del. Ch. July 11, 2005); *In re New Valley Corp.*, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001); *Strassburger v. Earley*, 752 A.2d 557, 570–71 (Del. Ch. 2000); *In re Dairy Mart Convenience Stores, Inc.*, 1999 WL 350473, at *17 (Del. Ch. May 24, 1999); *In re MAXXAM, Inc.*, 659 A.2d 760, 771 (Del. Ch. 1995).

[79] *In re Ocean Drilling & Exploration Co. S'holders Litig.*, 1991 WL 70028, at *7 (Del. Ch. Apr. 30, 1991); *Steiner v. Sizzler Rests. Int'l, Inc.*, 1991 WL 40872, at *1 (Del. Ch. Mar. 19, 1991) (Allen, C.); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 505 (Del. Ch. 1990).

[80] *Weinberger*, 457 A.2d at 711; *Reis*, 28 A.3d at 462.

[81] 8 *Del. C.* § 262(b); *see Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 57–58 (Del. Ch. 2011) (explaining the "market-out exception" and the "exception to the exception"

In substance, the two conversions in this case operate like stock-for-stock mergers in which stockholders in the Delaware corporations have their shares converted into the right to receive shares of Nevada corporations. If the Company's and Holdings' shares did not trade publicly, bringing them within the market-out exception, then the stockholders would have appraisal rights.[82] The court could not shirk an appraisal inquiry, which the DGCL would require.[83] The court likewise can conduct an entire fairness inquiry and consider, under the substantive dimension, whether stockholders received the substantial equivalent of what they had before.

### 4. Evidence Of Unfairness

When entire fairness is the standard of review, and when a plaintiff "alleges facts making it reasonably conceivable that the transaction was not entirely fair to stockholders, the granting of a motion to dismiss is inappropriate, because the burden is on the defendants to develop facts demonstrating entire fairness."[84] The plaintiffs have pled facts supporting an inference that the conversions were not entirely fair.

The plaintiffs have pled facts sufficient to call into question the substantive dimension of fairness, because the stockholders will not receive the substantial

---

in the context of merger with stock election); *see also Dofflemyer v. W. F. Hall Printing Co.*, 432 A.2d 1198, 1201–02 (Del. 1981) (holding that statutory procedures for withdrawing appraisal rights apply equally to cash-for-stock and stock-for-stock mergers).

[82] 8 *Del. C.* §§ 262(b) & 266(c)(5).

[83] 8 *Del. C.* § 262(b).

[84] *Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020).

equivalent of what they had before. When the Company and Holdings were Delaware corporations, the unaffiliated stockholders enjoyed all of the litigation rights provided by Delaware law. After the conversion, the unaffiliated stockholders will possess only the litigation rights provided by Nevada law. For the reasons already discussed, those litigation rights are inferably less than what Delaware provides.

The plaintiffs also have pled facts sufficient to call into question the procedural dimension of fairness. The goal of procedural fairness is to replicate arm's length bargaining. The defendants did not make any effort to replicate arm's length bargaining. Management proposed the conversions, the Board recommended them, and Holdings and Maffei approved them.

The unaffiliated stockholders' voting pattern supports an inference of unfairness. Just as an informed vote by unaffiliated stockholders *in favor* of a conflicted transaction is evidence of fairness,[85] an informed vote by unaffiliated stockholders *against* a conflicted transaction suggests unfairness. Here, the unaffiliated stockholders resoundingly rejected the conversions.

The defendants observe that in *Williams v. Geier*,[86] a majority of the Delaware Supreme Court considered a challenge to a charter amendment that adopted a tenured voting structure. A family group that held a majority of the shares approved

---

[85] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 715 (Del 2023) ("We find no error with the Vice Chancellor's determination to give the vote some weight.").

[86] 671 A.2d 1368 (Del. 1996).

the amendment without a majority of the minority vote. Three-quarters of the minority shares were present at the meeting, and two-thirds of those shares voted in favor, but enough of the minority shares did not participate that the amendment failed to secure support from a majority of the minority.[87] The plaintiffs pointed to that fact as evidence of unfairness, but the Delaware Supreme Court disagreed:

> Where, as here, there is a controlling stockholder or a controlling bloc, there is no requirement under the Delaware General Corporation Law that the transaction be structured or conditioned so as to require an affirmative vote of a majority of the minority group of outstanding shares. In those parent-subsidiary situations where the circumstances call for an entire fairness analysis, the burden is normally on the defendants to show entire fairness, but if a majority of the minority votes in favor under certain circumstances, the burden shifts to the plaintiff to show unfairness. The converse does not apply, however—namely, the failure to obtain a majority of the minority does not give rise to any adverse inference of invalidity.[88]

The *Williams* decision predated by almost two decades the decisions in *MFW*, *Corwin*, and *C&J Energy* that stressed the importance of informed stockholder voting and de-emphasized the role of fiduciary duty litigation.[89] The assertion in *Williams* that the

---

[87] *Id.* at 1374.

[88] *Id.* at 1382 (citations omitted).

[89] *MFW*, 88 A.3d at 644 ("The simultaneous deployment of the procedural protections employed here create a countervailing, offsetting influence of equal—if not greater—force. That is, where the controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard."); *Corwin*, 125 A.3d at 312–13 ("[W]hen a transaction is not subject to the entire fairness standard, the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the

minority stockholders' rejection of a transaction should not carry any weight in the fairness analysis is no longer persuasive in light of the increased emphasis that Delaware law places on stockholder votes.[90]

The defendants contend that other benefits of Nevada incorporation render the conversion fair, such as lower franchise taxes and a greater ability to recruit management personnel. The reduction in franchise taxes appears immaterial given the size of the Company and Holdings. The greater ability to recruit management

---

economic merits of a transaction for themselves."); *C&J Energy Servs., Inc. v. City of Miami Gen. Empls.'*, 107 A.3d 1049, 1070 (Del. 2014) ("When a board exercises its judgment in good faith, tests the transaction through a viable passive market check, and gives its stockholders a fully informed, uncoerced opportunity to vote to accept the deal, we cannot conclude that the board likely violated its *Revlon* duties.").

[90] Another aspect of *Williams* reflects formalistic thinking that is no longer persuasive. The Delaware Supreme Court held under a summary judgment standard that a tenured voting system did not confer any non-ratable benefit on the controlling stockholder group. *Williams*, 671 A.2d at 1378. In practice, because the controlling group was more likely to hold its shares rather than sell them, and because the controlling group pushed through the tenured voting scheme to minimize the influence of dissident factions, it seems plain that the controlling group sought and obtained a benefit. More recent decisions take a more realistic approach by recognizing that measures which nominally treat all stockholders equally can in fact confer a disproportionate, non-ratable benefit on a controller. *See IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at \*8–9 (Del. Ch. Dec. 11, 2017); *In re Google Inc. Class C S'holder Litig.*, C.A. No. 7469–CS, at 95–96 (Del. Ch. Oct. 28, 2013) (TRANSCRIPT).

The norm of equal treatment resonates deeply in American culture, but we should not ignore the fact that nominally equal treatment can have disproportionate effects. That generally will not be the case when recipients are similarly situated. It often will be the case when recipients are differently situated. In a controlled company, the stockholder controller and the unaffiliated stockholders are differently situated. Nominally equal treatment in a controlled company can therefore lead to disproportionate and inequitable results.

personnel seems to be a function of reduced litigation exposure, so it is not really a separate benefit. Regardless, those allegedly countervailing benefits cannot be assessed at this stage.

The plaintiffs have alleged facts supporting a reasonable inference that the conversions are not entirely fair. The complaint therefore states a claim on which relief can be granted.

## C.     Preventing Litigation Rights From Becoming Second-Class Rights.

Holding that the plaintiffs have stated a claim in this action fulfills important public policies related to Delaware's effort to maintain a balanced legal regime. As discussed previously, Delaware strives to gives substantial discretion to managers to build businesses and create value while at the same time offering protections to investors so that they willingly contribute their capital to Delaware corporations. For investor protections to be meaningful, litigation rights cannot become second-class rights.

Stockholders are widely regarded as possessing three fundamental rights: to sell, vote, and sue.[91] Each fundamental right represents a category of entitlements that stockholders possess: economic rights, governance rights, and litigation rights.[92]

---

[91] *Strougo v. Hollander*, 111 A.3d 590, 595 n.21 (Del. Ch. 2015).

[92] *See* Charles R. Korsmo & Minor Myers, *The Single-Owner Standard and The Public-Private Choice,* 47 J. Corp. L. 675, 684 (2022) ("Stockholders are commonly said to have three basic entitlements: (1) the right to pro rata residual distributions from the corporation, (2) the right to vote to elect directors and to pass on certain other

It seems readily apparent that under current Delaware law, a transaction that cuts back on either economic rights or governance rights would trigger entire fairness review. Envision a scenario in which the Company merges with another Delaware corporation, the high-vote shares are converted into identical high-vote shares of the resulting corporation, and the low-vote shares are converted into nearly identical low-vote shares of the resulting corporation—the sole difference being that the new shares are subject to a redemption right. Assume the resulting corporation can exercise the redemption right at any time and from time to time to buy in low-vote shares at a 20% premium to the *pro rata* value of the Company at the effective time. Because Maffei, through Holdings, controls the resulting corporation, he can decide whether and when to redeem the low-vote shares. If the value of the corporation appreciates by more than 20%, he can exercise the redemption right. The corporation would capture the incremental value, but because Holdings' ownership percentage would increase, Maffei benefits. It seems obvious that the merger would be an interested transaction, implemented by a stockholder controller, in which the stockholder controller receives a non-ratable benefit. Entire fairness would govern.

Now forget the redemption right. Assume the merger converts the Company's low-vote shares into no-vote shares. The answer still seems obvious. The loss of voting power inures to Holdings' benefit. Before the merger, only a long-form squeeze-out

---

matters like mergers; and (3) the right to enforce the directors' obligations of fidelity.").

was possible. After the merger, a short-form squeeze-out is on the table, which changes the game for the unaffiliated holders.[93] The merger is therefore a self-interested one, and entire fairness again would govern.

The same should be true for litigation rights. They are not second-class rights. They enable parties to access the courts, which is foundational to a civil society and necessary to protect all other rights.

> Without the ability to obtain a judgment from a court, backed by the power of the state, other rights become meaningless. Unless the holder of the right has some other source of leverage, like influence, economic power, or a willingness to deploy extra-legal force, then the counterparty can ignore the right. Without courts to enforce them, even voting rights can become nullities. In a civil society, what renders a right meaningful is access to the courts and, with a judgment in hand, the power of the state.[94]

Value ultimately depends on legal rights, because "the market will only value rights that the law would protect, and, thus, the price of an asset is inescapably dependent on the legal entitlements of the holder of that asset."[95] Economic rights and

---

[93] *See Glassman v. Unocal Expl. Corp.*, 777 A.2d 242 (Del. 2001) (establishing narrower fiduciary duty regime for short-form mergers in which only the duty of disclosure applies and a stockholder's exclusive remedy is generally an appraisal; accepting the same arguments for not applying entire fairness that were rejected in *Roland Int'l Corp. v. Najjar*, 408 A.2d 1032 (Del. 1979), *overruled in part by Weinberger*, 457 A.2d at 715 (overruling *Roland* as to business-purpose test but not as to application of entire fairness to short-form mergers)).

[94] *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 591 (Del. Ch. 2023). The vast literature on access to justice both undergirds and develops these concepts. For one convenient entry point, consider volume 86 of the Fordham Law Review, a symposium issue on access to justice from 2018.

[95] Korsmo & Myers, *supra*, at 704 (citing Thomas Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 731–32 (1998) ("[N]early everyone agrees that

governance rights remain meaningful only to the extent that litigation rights back them up. Without legal protection, an investor's capital becomes a gift.

From the perspective of equity, Delaware law should be just as concerned about transactions that reduce stockholders' litigation rights as it is about transactions that reduce their economic rights or governance rights.[96] This decision treats litigation rights as first-class rights.

## D.     The Availability Of Injunctive Relief

The defendants finally argue that even if the plaintiffs have stated a claim on which relief can be granted, they cannot obtain an injunction blocking the Company and Holdings from leaving Delaware. They seem to think that as a matter of policy,

---

the institution of property is not concerned with scarce resources themselves ('things'), but rather with the rights of persons with respect to such resources.").

[96] The role of equity in protecting litigation rights has become more important, because the Delaware Supreme Court recently confirmed that Section 242(b)(2) does not provide protection against modifications to litigation rights. *In re Fox Corp./Snap Inc.*, — A.3d —, 2024 WL 176575 (Del. Jan. 17, 2024). Under the reasoning of that case, Section 242(b) of the DGCL provides statutory protection both for rights that appear expressly in the certificate of incorporation and for rights which the DGCL establishes and incorporates by default into every certificate of incorporation. *See id.* at *10 ("Class-based powers or rights incorporated through the DGCL's default provisions are also expressed in the charter for purposes of Section 242(b)(2)."). But the Delaware Supreme Court held that the right to sue is not one that the DGCL recognizes expressly or implicitly. *Id.* It follows that a charter amendment can impose qualifications, restrictions, or limitations on that right without a statutory class vote. Mergers have long been able to modify all types of stockholder rights, including litigation rights. *See Fed. United Corp. v. Havender*, 11 A.2d 331, 339–40 (Del. 1940) (permitting use of merger to convert preferred stock carrying right to accumulated dividends into new preferred stock and Class A common stock, thereby eliminating the dividend overhang). As a practical matter, only equitable review protects litigation rights.

47

a Delaware court cannot enjoin an entity from leaving the state. That assertion goes too far. In extreme scenarios, courts have the power to prevent persons and assets from leaving their jurisdiction when doing so is necessary to preserve their ability to award final relief.[97] In theory, therefore, this court could enjoin the Company or Holdings from departing Delaware if the equities warranted it. But the circumstances in which the equities might warrant that extreme result are limited. They are not present here.

Before addressing the availability of an injunction, a cautionary note is in order about pleading-stage efforts to rule out remedies. A Rule 12(b)(6) motion challenges whether a plaintiff has stated a claim on which relief could be granted. The motion does not target the types of relief that a plaintiff might obtain. A court determines remedies after trial, so a pleading-stage assessment is usually premature.[98] In some

---

[97] *See* 6 *Del. C.* § 1307(a) (authorizing injunctive relief to block fraudulent transfer); *Destra Targeted Income Unit Inv. Tr. v. Parmar*, 2017 WL 373207, at *2 (Del. Ch. Jan. 25, 2017) (granting preliminary injunction to prevent "defendants and parties acting in concert with them from distributing cash and other securities that they will receive in connection with the transactions governed by" a merger agreement alleged to be a fraudulent conveyance where there was "[a] meaningful threat that a defendant may render relief meaningless by dissipating assets or removing them from the court's jurisdiction."); *Mitsubishi Power Sys. Americas, Inc. v. Babcock & Brown Infrastructure Grp. US, LLC*, 2009 WL 1199588, at *6 (Del. Ch. Apr. 24, 2009) (issuing a temporary restraining order preventing the defendant from transferring assets other than in the ordinary course of business where there was a risk that the defendant could defeat the court's ability to adjudicate the case by transferring its assets out of the jurisdiction).

[98] *E.g.*, *Delawareans for Educ. Opportunity v. Carney*, 199 A.3d 109, 178 (Del. Ch. 2018) (declining to rule on remedies at the pleading stage, writing that "[w]hether and what kind of remedy issues should be addressed at a future date."); *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *17 (Del. Ch.

situations, however, ruling at the pleading stage on whether a remedy will be available can assist in the simplification of the case and the formulating of issues for trial, which are important parts of the trial court's case-management function.[99]

The plaintiffs have asked the court to enjoin the conversions. To obtain a permanent injunction, the plaintiffs will have to prevail on the merits and prove that "other remedies are inadequate."[100] To meet that test, a plaintiff need not show irreparable harm. "A showing of irreparable harm can satisfy that requirement. But establishing irreparable harm is not strictly necessary."[101] Conversely, if legal remedies are adequate, then a plaintiff cannot make the showing necessary for injunctive relief.[102]

---

Jan. 12, 2015) ("At the pleadings stage, the court will not rule out the possibility of other remedies, such as rescissory damages."); *see Ambac Assur. Corp. v. EMC Mortg. Corp.*, 2009 WL 734073, at *2 (S.D.N.Y. Mar. 16, 2009) (denying defendant's request to strike rescissory damages on the basis that it was premature); *Assured Guar. Mun. Corp. v. UBS Real Est. Secs., Inc.*, 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012) ("It would be premature to strike a remedy at the pleadings stage.").

[99] *See Goldstein v. Denner*, — A.3d —, —, 2024 WL 303638, at *13 (Del. Ch. Jan. 26, 2024) (discussing trial court's case management authority); *Sunder Energy, LLC v. Jackson*, 2023 WL 8868407, at *16 n.39 (Del. Ch. Dec. 22, 2023) (same); *Harris v. Harris*, 289 A.3d 310, 342–43 (Del. Ch. 2023) (same).

[100] *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1228 (Del. Ch. 2022).

[101] *Id.*

[102] *Id.* at 1228–30.

The standard legal remedy is money damages. It seems quite likely that the court can craft a monetary remedy in this case that would be adequate. The remedial challenge will be to quantify the extent of the harm, if any, that moving from Delaware to Nevada imposes on the unaffiliated stockholders.

One way to determine the quantum of harm would be to value the Company pre-conversion as a Delaware corporation, then value the Company post-conversion as Nevada corporation, subtract the Nevada value from the Delaware value, and calculate a per share amount. That would be hard.

But there is another way to get at the delta. The Company's stock has a trading price. In the conversion, nothing will change except the Company's corporate domicile. Maffei's control will remain constant. The Company's business will remain constant. The only independent variable is the law governing its internal affairs.

Given that set-up, the change in the Company's trading price should help quantify the harm, if any, caused by the conversion. As long as the market for the Company's common stock is semi-strong-form efficient, then the price reaction should be indicative. Note that the stock price need not fairly approximate a pro rata share of the Company's intrinsic value for the price reaction to matter. As long as any pricing disconnects remains consistent across variables other than the governing law, the price impact should provide insight.

Not only that, but the announcement of the conversion should have a relatively clean price impact. The Company's conversion was not conditioned on a majority-of-the-minority vote, so nothing could prevent Holdings from implementing it. There is,

of course, always some uncertainty about whether a transaction will close, but here, the likelihood of closure would have been high. The price reactions to other events, such as the announcement of the vote or the filing of this litigation, may provide additional datapoints.

That does not make the price reaction the be all and end all. Considerable scholarly literature calls into question the ability of investors to price governance structures at the IPO phase.[103] Similar uncertainty could exist about the ability of investors to price changes in governance structures. Intuitively, however, a change in governance structure should present a cleaner question. At the IPO stage, a firm's economic prospects dominate, and the way a stockholder controller, the board, or management may use the governance rights they possess is relatively unknown. For the conversion, the only question is a change in the governing law, and the Company's fiduciaries have a track record.

Because of the narrow issue that this case presents, it seems likely that the court will have a sufficiently reliable basis to craft a monetary award for any harm that the Company's stockholders suffer. A judgment against the defendants in that amount should provide the plaintiff with a fully adequate remedy. The court will

---

[103] *See generally* Choi, *supra*, at 74–78 (collecting scholarship casting doubt on whether IPO market is informationally efficient); *id.* at 83–91 (using game theory to demonstrate that even if the IPO market is informationally efficient, governance structures are likely to be mispriced so long as different firms have different optimal governance structures and outside investors are informationally disadvantaged relative to insiders); *id.* at 91–94 (calling into question ability of private ordering and liability regimes to correct for IPO mispricing).

retain jurisdiction over the individual defendants even after the conversion is complete. The court can enter a judgment against any of them who are held liable. The plaintiffs can use standard collection procedures to enforce the judgment. If that requires domesticating judgments in other jurisdictions and enforcing them there, then the plaintiffs can do that.

The closing of the conversion will not alter anything else about the case. By statute,

> [t]he conversion of a corporation out of the State of Delaware in accordance with this section and the resulting cessation of its existence as a corporation of this State pursuant to a certificate of conversion to non-Delaware entity shall not be deemed to affect … the personal liability of any person incurred prior to such conversion, nor shall it be deemed to affect the choice of law applicable to the corporation with respect to matters arising prior to such conversion.[104]

Any liability for the conversion necessarily arises prior to the mystical singularity of the effective time. This case will go forward, governed by Delaware law, regardless of whether the Company's conversion closes. The same is true for the conversion involving Holdings.

Injunctive relief is therefore off the table. The pendency of this litigation should not delay the conversions from closing.

### III.   CONCLUSION

The defendants' motion to dismiss is granted as to the plaintiffs' request for injunctive relief. Otherwise, the motion is denied.

---

[104] 8 *Del. C.* § 266(e).